Jennifer R. Barnes
Federal Defenders of Eastern Washington & Idaho
306 E. Chestnut Ave.
Yakima, WA 98901
(509) 248-8920

Attorney for Defendant
Jose Francisco Aguirre

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
HONORABLE REBECCA PENNELL

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>Jose Francisco Aguirre,<br>　　　　　　　　Defendant. | No. 1:25-CR-2016-RLP-1<br><br>Defendant's Sentencing Memorandum |

Jose Francisco Aguirre, by and through his attorney, Jennifer Barnes, for the Federal Defenders of Eastern Washington and Idaho, hereby submits his sentencing memorandum. For the reasons explained below, Mr. Aguirre recommends a sentence of 12 months plus 1 day imprisonment, to be followed by five (5) years of supervised release. Mr. Aguirre maintains such a sentence is sufficient but not greater than

Defendant's Sentencing Memorandum - 1

necessary to satisfy the statutory goals for sentencing found in 18 U.S.C. § 3553(a).

## I. Status of the Case

On February 18, 2025, Jose Francisco Aguirre was arraigned on the Indictment herein. Less than two months later, on April 10, 2025, Mr. Aguirre pled guilty to Count 1 of the Indictment: Distribution of 50 grams or more of actual (pure) methamphetamine, in violation of 21 §§ U.S.C. 841(a)(1), (b)(1)(A)(viii).[1]

A sentencing hearing is currently scheduled for July 17, 2025, in Yakima, Washington.

## II. Discussion of Sentencing Considerations

### A. Offense Level, Enhancements and Criminal History

Mr. Aguirre does not have any objections to the calculations in the draft PSR Presentence Investigation Report ("PSR") disclosed on June 5, 2025.[2] The guideline range was calculated to be 70 to 87 months. Mr.

---

[1] ECF 1.

[2] ECF 26.

Defendant's Sentencing Memorandum - 2

Aguirre believes, for the reasons explained below, that a variance below the guideline range is appropriate in this case.

### B. Sentencing Factors Under 18 U.S.C. § 3553(a)

In determining whether a sentence within the advisory guidelines is appropriate, it is important to recall that the over-arching sentencing directive for a sentencing court is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Kimbrough v. United States*, 128 S.Ct 558, 570 (2007). The advisory sentencing guidelines are only one factor to consider in accomplishing the goals of sentencing as set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 125 S.Ct. 738 (2005).

A sentencing court cannot presume that a sentence within the advisory guideline range is reasonable. *Nelson v. United States*, 129 S.Ct 890 (2009). The guidelines factor cannot be given any more or less weight than any other sentencing factor enumerated in 18 U.S.C. § 3553(a). *United States v. Carty,* 520 F.3d 972, 991 (9th Cir. 2008).

Defendant's Sentencing Memorandum - 3

1. <u>**Nature and circumstance of the offense, and the history and characteristics of Mr. Aguirre**</u>.  18 U.S.C. § 3553(a)(1).

The nature and circumstances of this offense involved the sale of methamphetamine and fentanyl by Mr. Aguirre to an informant. This offense is certainly serious, and Mr. Aguirre very much regrets his decision to engage in the conduct. Sadly, like so many others who find themselves before the Court for similar charges, Mr. Aguirre's own substance abuse, together with his inability to find any other way to earn a living after seriously injuring himself,[3] ultimately led to that decision. But now that he is sober, and his health is deteriorating, his remorse is profound; he is determined never to do anything like this ever again.

Mr. Aguirre did not receive much education as a child growing up in a rural part of Mexico, and he has worked in field labor since he was 12 years old.[4] He came to the United States like so many others, in the

---

[3] PSR ¶¶ 77, 86-87.

[4] PSR ¶ 75.

Defendant's Sentencing Memorandum - 4

hope of working hard and having a better life. He married and raised seven children,[5] but things all started to fall apart after he was injured, lost his job, and became a regular user of methamphetamine.[6] While his addiction was not so severe that he suffered withdrawals in jail, he does acknowledge that his use of drugs (combined with his injury and the loss of his ability to work in the agricultural field) were clearly what led him to engage in the offense conduct. He also recognizes that he could benefit from treatment.[7]

> 2. <u>The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.</u>  18 U.S.C. § 3553(a)(2)(A).

The recommended sentence reflects the seriousness of the offense because it is a sentence of imprisonment, for an individual who has never spent more than a month in jail.[8] Mr. Aguirre has repeatedly

---

[5] PSR ¶ 76.

[6] PSR ¶ 83.

[7] *Id.*

[8] PSR ¶¶ 44-52.

Defendant's Sentencing Memorandum - 5

expressed how difficult it is to be incarcerated, particularly given his fragile health conditions.[9] He is determined to never find himself in such a position again.

Mr. Aguirre believes that a sentence of 12 months plus one day, to be followed by five (5) years of supervised release, is a just punishment given his difficult life circumstances, his very timely acceptance of responsibility, and all the collateral consequences he faces based on this conviction, as discussed below.

### 3. The need for the sentence imposed to afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).

The Court must also consider what sentence is appropriate to provide deterrence, both generally and specifically as to the individual. Deterrence was long thought to be what Congress intended to achieve with mandatory minimum sentences in drug-trafficking offenses. But Congress scaled back on many of those minimums with its passage of the *First Step Act*, Pub. L. No. 115-391. This legislation signaled a

---

[9] PSR ¶ 77.

Defendant's Sentencing Memorandum - 6

recognition by lawmakers that decades-long prison sentences have not had the intended effect in terms of deterrence, along with the goal of improving outcomes by offering inmates access to evidence-based rehabilitation programs. Many writers urging the passage of the Act noted the increasing realization of this fact:

> There is little evidence that lengthy prison terms serve specific deterrence. Rather, imprisonment either has no effect on an inmate's future offending or perhaps even increases recidivism. This is hardly surprising given the absence of meaningful rehabilitative programs for inmates and, worse yet, the deplorable conditions of incarceration facilities. It has often been argued that prisons serve as "colleges for criminals," where offenders are psychologically damaged by incarceration, for instance, or learn new anti-social skills from their criminally involved peers, and thus come out more likely to recidivate … [a]s for general deterrence, research has largely failed to show that mandatory minimums decrease the commission of crime, and some studies suggest that such punishment schemes may even generate more serious crime.

Erik Luna, *Mandatory Minimums,* 4 Reforming Criminal Justice 117, 128-129.[10]

---

[10] http://academyforjustice.org/wpcontent/uploads/2017/10/7_Criminal_Justice_Reform_Vol_4_Mandatory-Minimums.pdf.

Defendant's Sentencing Memorandum - 7

Mr. Aguirre's offense conduct was serious, but he will pay a heavy price for it regardless of the sentence ultimately imposed. He has clearly learned the lesson that this Court would be hopeful that he would, and a period of incarceration longer than 12 months and one day would be greater than necessary to fulfill the goal of deterrence.

> 4. <u>The need for the sentence imposed to provide Mr. Aguirre with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>  18 U.S.C. § 3553(a)(2)(D).

Mr. Aguirre has significant health needs, which in undersigned counsel's experience, the Bureau of Prisons is unlikely to be able to adequately provide. He is extremely fearful that he may lose a leg due to the complications of his diabetes,[11] and this possibility will likely be much greater in a prison setting, where immediate interventions aren't always as readily available as they would be otherwise.

In addition, a prison sentence would likely be more onerous for Mr. Aguirre due to his status and the fact that he will almost certainly

---

[11] PSR ¶ 77.

Defendant's Sentencing Memorandum - 8

have a detainer lodged while there, so he would be ineligible for First Step Act and related programming, and early release to a Residential Reentry Center. A prison sentence will not afford him the opportunity for truly meaningful rehabilitation and training, as BOP has taken deliberate steps to limit the availability of such programs to those with his status. As a result, a lengthy period of imprisonment is unwarranted and potentially useless, in terms of the sentencing goals of treatment, educational and vocational training and medical care.

BOP excludes undocumented individuals subject to removal from a litany of programming options, including the RDAP program.[12] Deportable inmates are also prohibited from participating in the BOP's "compensated job-training program, Federal Prison Industries . . . [,] its

---

[12] *See* Jacob Schuman, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented*, THE MARSHALL PROJECT (Oct. 17, 2017, 10:00 PM), https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-the-undocumented; *see also* BOP Program Statement P5330.11 (Psychology Treatment Programs), § 550.53, Ex. 1 (noting "[a] deportable inmate is unqualified for the RDAP program"), available at https://www.bop.gov/policy/progstat/5330_011.pdf#page=23.

Defendant's Sentencing Memorandum - 9

reentry-focused Release Preparation Program and even from its faith-based Life Connections Program." *Id.*

For these reasons relating to his status and likely removal from the United States, in addition to the mitigating circumstances described above, Mr. Aguirre believes that a downward variance from the guideline range is appropriate in this case. *See United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994); *United States v. Charry Cubillos*, 91 F.3d 1342 (9th Cir. 1996).

### 5. The need to avoid unwarranted sentence disparities, and the flaws in the methamphetamine guidelines.

According to the United States Sentencing Commission's Judiciary Sentencing Information ("JSIN") data, those defendants with the same range as Mr. Aguirre, for the same offense and criminal history category, the average length of imprisonment was 35 months and the median length of imprisonment was just 30 months.[13] Also

---

[13] https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited June 20, 2025).

Defendant's Sentencing Memorandum - 10

noteworthy is the fact that, while 98% of defendants did receive a sentence of imprisonment, **35 individuals** received a sentence of probation or a fine only (and that is not even including those who provided substantial assistance). In addition, 76% of those defendants received a downward variance from the guideline range and **none** received an upward variance—which is unsurprising, given how flawed the methamphetamine guideline has been noted to be.

The Ninth Circuit has upheld categorical rejection of Guidelines based on policy grounds for the sentencing disparity between actual and mixture methamphetamine in addition to crack cocaine and powder cocaine, and for child pornography offenses.[14] And a significant number of district courts have rejected the purity-based guidelines (applying guidelines for methamphetamine-mixture base levels

---

[14] See *U.S. v. Hoover,* 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018) (Winmill, J); *Mitchell,* 624 F. 3d at 1030; *U.S. v. Henderson,* 649 F.3d at 964.

Defendant's Sentencing Memorandum - 11

instead) citing a variance based on a categorical policy disagreement.[15]

Courts are entitled to disagree with application of the Guidelines themselves on a policy basis, particularly where the guidelines "do not exemplify the Commission's exercise of its characteristic institutional role[,]" which is "to base its determinations on empirical data and national experience."[16] Courts rejecting the application of purity-based Guidelines have found, across the board, that the Sentencing Commission did not rely on any empirical data or rationale to justify the sentencing disparities between actual/pure methamphetamine and mixture methamphetamine.[17]

---

[15] *See Hoover*, WL 5924500, at *4 (Winmill, J); *Grover*, 2017 WL 2804012, at *4 (Winmill, J); *U.S. Hartle*, 2017 WL 2608221, at *4 (D. Idaho June 15, 2017); *U.S. v. Ferguson*, 2018 WL 3682509, at *3-4 (D. Minn. Aug. 2, 2018); *U.S. v. Saldana*, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018); *U.S. v. Harry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018).

[16] *Kimbrough*, 552 U.S. at 109.

[17] Courts have held that purity-based penalties unreasonably skew sentences for low-level offenders. *See e.g. U.S. Hayes*, 948 F.Supp.2d 1009 (2013) (where the offender had no knowledge of the purity of methamphetamine in their possession); *U.S. v. Ortega*, 2010 WL

Defendant's Sentencing Memorandum - 12

The Sentencing Commission made drug purity relevant in part because "possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."[18] Yet methamphetamine seized at all distribution levels is remarkably pure, making sentencing variation based on purity testing outdated, arbitrary, and ultimately unjust.[19] The Commission departed from its characteristic institutional role, using no empirical data to justify the 10:1 ratio. Thus, the Court is warranted in disagreeing with the policy of methamphetamine purity-based Guidelines and imposing a variance in this case.

---

1994870 (D. Neb. May 17, 2020) (purity-based penalties blur the distinction between high and low level distributors).

[18] §2D1.1 cmt.9; *Grover*, 2017 WL 2804012, at 3 n.4 ("although [§2D1.1 cmt.9] does not apply directly to methamphetamine, the purity-based [] penalties evidences this same assumption.").

[19] In 2018 the national average purity of methamphetamine was over 90%, and only increasing. *U.S. v. Bean*, 371 F. Supp. 3d 46, 52 (D.N.H. 2019) (citing 2018 DEA National Drug Threat Assessment).

Defendant's Sentencing Memorandum - 13

## Conclusion

Mr. Aguirre understands that he involved himself in a serious crime, and he is very remorseful for his conduct. He took immediate responsibility for his conduct, and he has made clear that he will never engage in anything like this in the future. Mr. Aguirre respectfully recommends a sentence of 12 months plus one day, to be followed by five (5) years of supervised release.

Dated: June 20, 2025.

                                      Respectfully Submitted,

                                      By s/ Jennifer R. Barnes
                                            Jennifer R. Barnes, WSBA# 23664
                                            Attorney for Jose Aguirre
                                            Federal Defenders of Eastern
                                            Washington and Idaho
                                            306 East Chestnut Avenue
                                            Yakima, Washington 98901
                                            (509) 248-8920
                                            (509) 248-9118 fax
                                            Jennifer_Barnes@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Bree Black Horse, Assistant United States Attorney.

By s/ Jennifer R. Barnes
Jennifer R. Barnes, 23664

Defendant's Sentencing Memorandum - 15